United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 11, 1997 Decided November 18, 1997 

 No. 96-1096

 General Electric Company, 

 Petitioner

 v.

 United States Department of Commerce, National Oceanic 

 and Atmospheric Administration, 

 Respondent

 American Forest and Paper Association Inc., et al., 

 Intervenors

 Consolidated with

 Nos. 96-1101, 96-1102, 96-1103, 96-1104, 96-1105

 On Petitions for Review of Orders of the 

 United States Department of Commerce

 ---------


 E. Edward Bruce argued the cause for the non-insurance 
petitioners. With him on the briefs were James R. Bieke, G. 
William Frick, Philip A. Cooney, Dean A. Calland, Thomas 
B. Smith, Harold E. Mesirow, James L. Connaughton, David 
F. Zoll, Ronald A. Shipley, Christina Franz, L. Charles 
Landraf, Linda K. Breggin, and Cynthia H. Evans.

 Marilyn L. Lytle argued the cause and filed the briefs for 
petitioners American Institute of Marine Underwriters and 
Water Quality Insurance Syndicate.

 Monica P. Medina, General Counsel, U.S. Department of 
Commerce and Naikang Tsao, Attorney, U.S. Department of 
Justice, argued the cause for respondent. On the brief were 
Lois J. Schiffer, Assistant Attorney General, and Eileen T. 
McDonough, Attorney.

 Peter H. Lehner argued the cause for intervenor Natural 
Resources Defense Council, Inc. With him on the brief was 
Sarah Chasis.

 Thomas S. Udall, Attorney General, State of New Mexico, 
Charles de Saillan, Assistant Attorney General, and Charles 
E. Magraw, Assistant Attorney General, State of Montana, 
were on the brief for amici curiae State of New Mexico, et al.

 Before: Silberman, Rogers and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel.

 Tatel, Circuit Judge: Seventeen months after the oil 
tanker Exxon Valdez ran aground in Prince William Sound, 
spilling almost eleven million gallons of North Slope crude, 
Congress enacted the Oil Pollution Act of 1990 to make 
parties responsible for oil spills liable for damage to natural 
resources. In this case, we consider both procedural and 
substantive challenges to the final rule that the National 
Oceanic and Atmospheric Administration issued pursuant to 
the Act. Concluding that the final rule's authorization for 
removal of residual oil suffers from a lack of reasoned deci-
sionmaking, we vacate this portion of the rule and remand to 
the agency for further consideration. With the agency's 
consent, we also vacate and remand the final rule's authoriza-


tion for recovery of legal fees. In all other respects, we 
sustain the final rule.

 I

 Prior to the Oil Pollution Act of 1990, Pub. L. No. 101-380, 
104 Stat. 486 (codified at 33 U.S.C. ss 2701-20, 2731-37, 
2751-53, 2761 (1994)) ("OPA"), natural resource damages 
resulting from oil spills were assessed pursuant to the Com-
prehensive Environmental Response, Compensation, and Lia-
bility Act of 1980, Pub. L. No. 96-510, 94 Stat. 2767 (codified 
as amended in scattered sections of the U.S.C.), amended by 
the Superfund Amendments and Reauthorization Act of 1986, 
Pub. L. No. 99-499, 100 Stat. 1613 (1986) ("CERCLA"), which 
authorizes "trustees" (e.g., federal, state, or local officials) to 
assess and collect damages from all types of environmental 
polluters. In Kennecott Utah Copper Corp. v. United States 
Dep't of the Interior, 88 F.3d 1191 (D.C. Cir. 1996), and Ohio 
v. United States Dep't of the Interior, 880 F.2d 432 (D.C. Cir. 
1989), we reviewed and largely sustained the natural resource 
damage assessment regulations that the Interior Department 
issued pursuant to CERCLA.

 OPA focuses specifically on oil discharges in the nation's 
waterways and coastlines. Amending the Clean Water Act, 
section 4201(a) of OPA directs the President, who has since 
delegated his authority to the Environmental Protection 
Agency and the Coast Guard, to remove spilled oil. 33 U.S.C. 
s 1321(c)(1). Section 1002, the primary focus of this litiga-
tion, makes responsible parties liable for "[d]amages for 
injury to, destruction of, loss of, or loss of use of, natural 
resources, including the reasonable costs of assessing the 
damage." Id. s 2702(b)(2)(A). Only a "trustee" appointed by 
either the President, a governor, the governing body of an 
Indian tribe, or the head of a foreign government may 
recover such damages. Id. s 2706(a)-(b). The Act limits 
responsible party liability, e.g., id. s 2704(a)(3) (limiting liabil-
ity of any offshore facility except a deepwater port to removal 
costs plus $75 million per incident), but if trustees need 
additional funds for restoration, they can draw upon the Oil 


Spill Liability Trust Fund, id. s 2712(a)(2), a fund financed 
primarily by a five cent per barrel tax on imported and 
domestic oil, 26 U.S.C. s 4611(c)(2)(B) (1994).

 To facilitate damage recovery, OPA directs the President, 
acting through NOAA, to "promulgate regulations for the 
assessment of natural resource damages ... resulting from a 
discharge of oil." 33 U.S.C. s 2706(e)(1). Natural resource 
damage assessments made by a trustee in accordance with 
those regulations "shall have the force and effect of a rebutta-
ble presumption on behalf of the trustee in any administrative 
or judicial proceeding" under OPA. Id. s 2706(e)(2).

 Engaging in a six-year rulemaking process, which produced 
proposed rules in 1994, 59 Fed. Reg. 1062 (1994), and in 1995, 
60 Fed. Reg. 39,804 (1995), NOAA promulgated its "final 
rule" governing trustee assessment of natural resource dam-
ages in 1996. Natural Resource Damage Assessments, 61 
Fed. Reg. 440-510 (1996) (adding 15 C.F.R. ss 990.10-
990.66). The final rule reflects NOAA's determination to 
accomplish OPA's goals through a restoration-based ap-
proach, focusing not merely on assessing environmental dam-
ages--the approach taken by CERCLA--but rather on devel-
oping and implementing plans for restoring and rehabilitating 
damaged resources or services.

 The final rule lays out a three-stage procedure for assess-
ing injuries resulting from oil spills and for developing and 
implementing plans to restore damaged resources. Termed 
the "Preassessment Phase," the first stage requires trustees 
to determine whether they have jurisdiction under OPA to 
pursue restoration activities and whether actions taken by 
other agencies have adequately addressed the injuries. This 
first stage also requires the trustee to collect and analyze 
pertinent data, prepare a notice of intent to conduct restora-
tion planning activities, and open a publicly available adminis-
trative record. 15 C.F.R. ss 990.41-990.45 (1997).

 The second stage, the "Restoration Planning Phase," has 
two substages. The "injury assessment" substage requires 
the trustee to determine whether an injury has occurred, 


whether a "pathway" can be established between the dis-
charged oil and the injury, and whether the injury resulted 
from the discharge. Id. s 990.51(a)-(b). If the trustee deter-
mines that the oil discharge caused an injury, the trustee 
must quantify its degree and spatial and temporal extent, 
including the amount of services destroyed. Id. s 990.52(a)-
(b). If that analysis leads the trustee to conclude that the 
injury requires restoration, the trustee proceeds to the "res-
toration selection" substage, where the trustee identifies a 
"reasonable range" of restoration alternatives, evaluating 
them against several factors, including cost, potential success, 
risk of collateral injury, and public health and safety. Id. 
ss 990.53-990.54. Once the trustee chooses the restoration 
plan that best restores the value destroyed by the oil dis-
charge, the trustee develops a Draft Restoration Plan, setting 
forth the injury assessment procedures employed, the nature 
and extent of injuries resulting from the discharge, the 
restoration goals, the range of restoration alternatives consid-
ered, how the alternatives were evaluated, and which alterna-
tives were chosen. Id. s 990.55(b). After giving the public 
an opportunity to review and comment on the Draft Plan, id. 
s 990.55(a), the trustee ends this stage by developing a Final 
Restoration Plan, id. s 990.55(d).

 In the third and final stage of the process, the "Restoration 
Implementation Phase," the trustee presents a written de-
mand for payment to the owner of the tanker or other party 
or parties responsible for the oil discharge. Id. s 990.62(a). 
If the responsible party refuses to satisfy the demand within 
ninety days, or if the trustee and the responsible party cannot 
agree on an alternative figure, the trustee may sue the 
responsible party or seek an appropriation from the Oil Spill 
Liability Trust Fund. Id. s 990.64(a). In any suit filed by 
the trustee, its damage assessment is entitled to a rebuttable 
presumption, id. s 990.13, if the trustee can demonstrate that 
its assessment procedures are "capable of providing assess-
ment information of use in determining the type and scale of 
restoration appropriate for a particular injury," id. 
s 990.27(a)(1), that any additional cost of a "more complex 
procedure" reasonably relates to the expected increase in the 


quantity or quality of information, id. s 990.27(a)(2), and, 
most important, that its assessment procedures are "reliable 
and valid for the particular incident," id. s 990.27(a)(3).

 Pursuant to section 1017(a) of OPA, which allows interested 
persons to petition this court to review any OPA regulation 
within ninety days of its promulgation, 33 U.S.C. s 2717(a), 
two groups of petitioners filed separate challenges to the final 
rule. The first group, the "industry petitioners," consists of 
General Electric, American Petroleum Institute, Beazer East, 
Chemical Manufacturers Association, Rhone-Poulenc, Zeneca 
Holdings, Stauffer Management, and Atkemix Thirty-Seven, 
Inc. These petitioners argue that NOAA acted arbitrarily 
and capriciously by authorizing trustees to employ an assess-
ment technique known as contingent valuation. They also 
argue that NOAA exceeded its authority by allowing trustees 
to remove residual sources of contamination, i.e., oil left 
behind by EPA and the Coast Guard, and to recover monitor-
ing and legal costs from responsible parties. The second 
group, "insurance petitioners," consists of the American Insti-
tute of Marine Underwriters and The Water Quality Insur-
ance Syndicate. They argue that the final rule is improperly 
retroactive and that it violates OPA because it authorizes 
trustees to recover what are known as passive-use values, 
fails to reiterate OPA's damage limitation provisions, impairs 
responsible parties' right to seek contribution under OPA, 
and grants trustees "uncontrolled discretion." Thirteen 
states, as amici, and the Natural Resources Defense Counsel, 
as intervenor, defend NOAA's final rule. We consider peti-
tioners' arguments in turn, beginning in section two with 
those advanced by industry petitioners. In section three, we 
address three issues raised by industry petitioners which, in 
view of representations NOAA made during these proceed-
ings, are now resolved. We take up insurance petitioners' 
arguments in section four. Where appropriate, we employ 
Chevron's two step analysis, Chevron U.S.A. Inc. v. Natural 
Resources Defense Council, Inc., 467 U.S. 837, 842-44 (1984), 
and the Administrative Procedure Act's arbitrary and capri-
cious standard. 5 U.S.C. s 706(2)(A) (1994).


 II

 We begin with section 990.13's rebuttable presumption. 
Relying on our decision in Chemical Mfrs. Ass'n v. Depart-
ment of Transp., 105 F.3d 702 (D.C. Cir. 1997), industry 
petitioners argue that rebuttable presumptions are appropri-
ate only when proof of one fact renders the existence of 
another fact so likely that assuming the existence of the 
inferred fact is both sensible and time-efficient. Chemical 
Manufacturers, however, applies only to rebuttable presump-
tions created by agencies and has no applicability where, as 
here, Congress created the presumption. Id. at 705 (legisla-
tive bodies, unlike administrative bodies, are "free to adopt 
presumptions for policy reasons").

 Industry petitioners also argue that the rebuttable pre-
sumption gives trustees a "powerful advantage" in any subse-
quent litigation and that the agency must issue regulations 
that are sufficiently "sound and credible" to deserve the 
presumption. Petitioners, however, cite no authority for this 
latter proposition, nor do they explain why the final rule's 
reliability and validity requirement would not satisfy their 
"sound and credible" standard. More important, it is not at 
all clear that the rebuttable presumption even gives trustees 
a "powerful advantage." In the final rule's preamble, NOAA 
"interprets" the rebuttable presumption as imposing upon 
responsible parties "the burdens of presenting alternative 
evidence on damages and of persuading the fact finder that 
the damages presented by the trustees are not an appropriate 
measure of damages." 61 Fed. Reg. at 443. As agency 
counsel described it at oral argument, the rebuttable pre-
sumption thus functions as nothing more than a "burden 
shifting exercise." Whatever the rebuttable presumption 
means and however it will work in practice, issues we need 
not resolve at this time, one thing is clear--before trustees 
can take advantage of the presumption, they must prove that 
their damage assessments are "reliable and valid for the 
particular incident." 15 C.F.R. s 990.27(a)(3).

 We turn to industry petitioners' specific challenges to the 
final rule.

 Contingent Valuation and Passive Use Values

 In valuing damage to natural resources caused by oil 
discharges, the final rule allows trustees to consider two 
types of losses: active and passive. "Active-use" losses refer 


to the loss of actual use of a natural resource. An oil spill 
that contaminates a National Seashore, for example, causes 
an "active-use" loss for those unable to use the beach for 
swimming or fishing. Under the final rule, the trustee devel-
ops a plan to restore the beach to its original condition and, 
while restoration takes place, to provide alternative fishing, 
swimming and other active-use opportunities.

 NOAA's final rule also authorizes recovery of what are 
known as nonuse or "passive" losses, the value individuals 
place upon the existence of natural resources, even if they 
never plan to make active use of them. In the case of the 
National Seashore, for example, people who have never used 
the beach may nevertheless value its existence. To assess 
this value, researchers employ a survey technique known as 
"contingent valuation," in which they create a hypothetical 
market and ask people--survey respondents--how much they 
would pay to preserve or protect a given resource. Averag-
ing the responses, researchers then determine the value the 
public places on the resource. See Jeffrey C. Dobbins, Note, 
The Pain and Suffering of Environmental Loss: Using 
Contingent Valuation to Estimate Nonuse Damages, 43 
Duke L.J. 879, 882 (1994).

 Because contingent valuation is not without controversy, 
NOAA commissioned a special panel to study the technique 
and report on its appropriateness for assessing natural re-
source damage. See 58 Fed. Reg. 4601, 4602-14 (1993) 
(Appendix I--Report of the NOAA Panel on Contingent 
Valuation). After considering the critiques of contingent 
valuation, the panel, which included two Nobel laureates, 
concluded that if properly conducted under strict guidelines, 
the technique can convey useful and reliable information that 
"can produce estimates reliable enough to be the starting 
point of a judicial process of damage assessment." Id. at 
4610. Based on the panel's report, NOAA's first proposed 
rule explicitly authorized trustees to employ contingent valua-
tion and provided detailed standards for using it. 59 Fed. 
Reg. at 1182-84. In its next proposed rule, however, and 
then again in its final rule, NOAA omitted all references to 
contingent valuation, instead authorizing trustees to choose 


whichever assessment techniques they wish, subject to sec-
tion 990.27's requirements, including reliability and validity 
for the particular incident. In appendix B to the final rule's 
preamble, NOAA included contingent valuation on a list of 
techniques trustees could choose to utilize. 61 Fed. Reg. at 
499. Describing its decision to provide trustees with such 
discretion, the agency said this:

 NOAA believes that the standards set forth in s 990.27 
 are sufficient to allow trustees and responsible parties to 
 determine the acceptability of a particular assessment 
 procedure for a given incident. NOAA supports the use 
 of all of the procedures discussed in Appendix B of the 
 preamble as reliable and valid within the appropriate 
 context and when performed in accordance with accepted 
 professional practices. NOAA does not believe that the 
 rule should set forth specific standards regarding the 
 implementation of individual procedures, as it is not 
 feasible to prescribe all valid uses of these procedures. 
 The validity and reliability of procedures will depend on 
 the circumstances of particular incidents.... Thus, 
 NOAA believes that most of the comments received, 
 which relate to potential problems with certain applica-
 tions of these procedures, will be dealt with in the 
 context of specific incidents.

Id. at 470.

 Industry petitioners argue that NOAA acted arbitrarily 
and capriciously by "ignoring" the panel's warning that con-
tingent valuation studies must be conducted subject to strin-
gent standards. Relying on our Kennecott decision, NOAA 
responds that this argument is not ripe for judicial review 
because the preamble's reference to contingent valuation 
neither imposes a legal obligation upon petitioners nor has 
any immediate effect upon them. While this argument has 
force with respect to petitioners' substantive challenge to the 
final rule, see discussion infra at 10-11, it has no applicability 
to their purely procedural challenge. The question we faced 
in Kennecott--whether the Interior Department exceeded its 


CERCLA authority by arguably authorizing recovery of cer-
tain damages through language in the regulation's pream-
ble--was not ripe because whether Interior had intended to 
bind anyone with the preamble's language was not at all 
clear. Until a trustee invoked the preamble to affect the 
outcome of a real dispute, we held, we lacked both the need 
and the factual basis for resolving the question. Kennecott, 
88 F.3d at 1222-23.

 Industry petitioners' purely procedural argument, that 
NOAA failed to consider relevant comments during the rule-
making process, is quite different. Unlike in Kennecott, 
where our treatment of the preamble issue would have bene-
fitted from a "concrete case," id. at 1223, we now know 
everything we need to know about NOAA's treatment of the 
administrative record. The issue petitioners present will 
never be more fit for review.

 Industry petitioners' argument fails, however. NOAA ig-
nored neither the panel's comments nor the criticisms of 
contingent valuation that the panel considered. It simply 
gave trustees discretion to use contingent valuation, so long 
as the technique produces, as required by section 990.27(a)(3), 
valid and reliable results for the particular incident. Docu-
menting its findings in the record, NOAA reasonably conclud-
ed not only that prescribing standards for using all possible 
assessment procedures in all possible situations would be 
infeasible, but also that general standards, such as those 
included in section 990.27, can adequately ensure that trust-
ees do not abuse their discretion. If a responsible party in a 
particular case believes that a trustee using contingent valua-
tion has produced either unreasonable or invalid results for 
the specific incident, it can withhold payment, forcing the 
trustee to file suit under section 990.64 and to establish 
validity and reliability under section 990.27 in order to gain 
the rebuttable presumption.

 Going beyond their procedural claim, industry petitioners 
argue that NOAA acted arbitrarily and capriciously by failing 
to bar contingent valuation altogether. Because this argu-


ment amounts to a facial challenge to the final rule that does 
not depend on the facts of a particular case, it is, like 
petitioners' purely procedural argument, ripe for review. But 
also like that argument, it fails. We held in Ohio that the 
Interior Department had not acted arbitrarily or capriciously 
by authorizing CERCLA trustees to use contingent valuation. 
Ohio, 880 F.2d at 478. Not only does nothing in the panel 
report or any other portion of the administrative record cast 
doubt on Ohio, but the panel report itself found that if 
performed correctly, contingent valuation can produce both 
useful and reliable results. 58 Fed. Reg. at 4610.

 Industry petitioners next argue that NOAA acted arbitrari-
ly by authorizing the recovery of passive-use values for 
temporary losses of natural resources. According to petition-
ers, passive-use losses occur only where resources are lost 
forever; temporary losses, they claim, can never give rise to 
passive-use losses. Although the administrative record lends 
support to NOAA's contention that temporary losses can 
cause loss of passive-use values, e.g., id. at 4608 (CV panel 
concluding that "interim passive-use values are additive over 
time"), we agree with NOAA that this issue is not ripe for 
judicial review. The proper time to address the question will 
come if and when a trustee actually assesses damages for 
temporary losses in a particular case. Unlike industry peti-
tioners' purely procedural argument and their challenge to 
NOAA's refusal to bar trustee use of contingent valuation, 
right now we lack both the factual record and the detailed 
findings needed to resolve their temporary loss argument.

 Removal Authority

 Section 990.53(b)(3)(i) of the final rule authorizes trustees 
to "[r]emove conditions that would prevent or limit the effec-
tiveness of any restoration action (e.g., residual sources of 
contamination)." 15 C.F.R. s 990.53(b)(3)(i). Explaining this 
provision, NOAA poses an example of a trustee needing to 
remove residual oil--oil left behind by EPA or the Coast 
Guard--in order to implement a restoration plan to replant or 
reseed vegetation. Without removal authority, NOAA claims, 


the trustee would be unable to reseed or replant the area 
contaminated by the residual oil, leaving restoration incom-
plete.

 Industry petitioners argue that because OPA delegates sole 
responsibility for oil removal to the President, NOAA exceed-
ed its statutory authority by authorizing trustees to remove 
residual oil. In support of their argument, petitioners point 
out that OPA treats restoration and removal separately and 
for each contains distinct definitional, limitation, and liability 
provisions. 33 U.S.C. s 2701(30) (defining "removal"); 
s 2706(d) (defining "natural resource damages"); s 2702(b) 
(liability provisions); s 2717(f) (statute of limitation provi-
sions). They also rely on section 1011 of OPA, which requires 
the President to:

 [C]onsult with the affected trustees designated under 
 section 2706 of this title on the appropriate removal 
 action to be taken in connection with any discharge of oil. 
 For the purposes of the National Contingency Plan, 
 removal with respect to any discharge shall be consid-
 ered completed when so determined by the President in 
 consultation with the Governor or Governors of the af-
 fected States. However, this determination shall not 
 preclude additional removal actions under applicable 
 State law.

Id. s 2711. From these provisions, industry petitioners con-
clude that it is the President, acting through EPA or the 
Coast Guard, who determines when removal is complete, and 
that OPA limits the role of trustees in removal operations to 
consultation with EPA and the Coast Guard.

 We would ordinarily analyze NOAA's interpretation of OPA 
under Chevron, asking first whether Congress spoke clearly 
to the issue, or if not, whether NOAA's interpretation of the 
statute is permissible and thus entitled to deference. Chev-
ron, 467 U.S. at 842-43. The parties disagree about whether 
NOAA is even entitled to Chevron deference given the pri-
mary role that EPA and the Coast Guard play in oil removal. 
See, e.g., Rapaport v. United States Dep't of Treasury, 59 
F.3d 212, 216-17 (D.C. Cir. 1995) (holding that the Office of 
Thrift Supervision receives no deference for its interpretation 


of the Federal Deposit Insurance Act because it shares the 
administration of the statute with other agencies). We need 
not resolve this dispute, however, or even the underlying 
question of statutory authority because, by not explaining the 
difference between the residual removal authority of section 
990.53(b)(3) and the language of the proposed rule, NOAA 
failed to exercise reasoned decisionmaking. See Motor Vehi-
cle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 
29, 43 (1983) (agency must provide a reasoned basis for its 
actions). The proposed rule provided that trustees, "[w]hen 
identifying primary restoration alternatives to be considered," 
should determine whether "[c]onditions exist that would limit 
the effectiveness of primary restoration actions (e.g., residual 
sources of contamination)." 60 Fed. Reg. at 39,832. As we 
read this provision, it did no more than encourage trustees to 
develop restoration plans not requiring removal of residual 
oil. Thus, if the trustee in NOAA's revegetation example 
found that oil left behind by EPA made revegetation impossi-
ble, the trustee would have to abandon the project and 
develop another restoration alternative.

 NOAA argues that under the proposed rule, the trustee 
could have actually removed the oil, but we think this conten-
tion conflicts with the proposed rule's plain language, which 
merely directs trustees to "consider" whether conditions exist 
that would make the primary restoration alternative impracti-
cal. By comparison, the final rule quite clearly authorizes 
trustees to "[r]emove conditions that would prevent or limit 
the effectiveness of any restoration action (e.g., residual 
sources of contamination)." 15 C.F.R. s 990.53(b)(3)(i). Yet 
nowhere has the agency explained this change. Indeed, 
NOAA's only comment on the final version of section 
990.53(b)(3) in the rule's preamble quotes verbatim from the 
proposed rule. See 61 Fed. Reg. at 452 ("trustees should 
consider whether activities exist that would prevent or limit 
the effectiveness of restoration actions (e.g., residual sources 
of contamination).").

 Not only has NOAA failed to explain this difference be-
tween the final rule, on the one hand, and its preamble and 
the proposed rule, on the other, but it has also not explained 


the interrelationship between trustees' residual removal au-
thority and the primary removal authority of EPA and the 
Coast Guard. If trustees are to have residual removal au-
thority, clearly explaining how and under what circumstances 
they will exercise such authority is critical, particularly since 
OPA requires the President to consult with trustees during 
primary removal actions. 33 U.S.C. s 2711. How, for exam-
ple, does the standard governing the President's primary 
removal authority differ from the standard governing trustee 
residual authority? What precisely is a trustee's role in 
primary removal, and what is the role of EPA and the Coast 
Guard, if any, with respect to a trustee's residual authority? 
May trustees remove residual oil even if EPA or the Coast 
Guard has considered and rejected a trustee's position during 
the consultation process? What happens if a trustee original-
ly agrees with the extent of primary removal, but later 
changes its mind? NOAA must answer these questions if it 
intends to give trustees residual removal authority. We also 
expect that a reviewing court will want to know not only that 
EPA and the Coast Guard agree that trustees should have 
residual removal authority, but also that the three agencies 
concur as to how they will coordinate removal activities. 
Because NOAA failed to address these central issues and to 
explain the difference between the proposed and final rules, 
we vacate section 990.53(b)(3)(i) and remand for further agen-
cy action.

 Monitoring Costs and Legal Fees

 Section 990.30 of the final rule defines reasonable assess-
ment costs to include both "monitoring and oversight costs" 
as well as "administrative, legal, and enforcement costs." 15 
C.F.R. s 990.30. Industry petitioners first contend that 
NOAA acted arbitrarily by including monitoring costs--the 
costs associated with trustee monitoring of the implementa-
tion of restoration plans and their environmental conse-
quences--as an element of assessment costs. Relying on 
adjacent OPA sections dealing with the Oil Spill Liability 
Trust Fund, they point out that one section, which makes the 
Fund available for payment of removal costs, explicitly men-
tions monitoring costs, 33 U.S.C. s 2712(a)(1), while the oth-


er, which makes the Fund available for restoration actions, 
contains no reference to monitoring costs, id. s 2712(a)(2). 
According to petitioners, the difference between these two 
sections shows that Congress intended to exclude monitoring 
costs from costs recoverable in restoration actions.

 We are unpersuaded. While monitoring costs do appear in 
one section but not the other, these provisions deal only with 
appropriate uses of the Fund, not with costs properly recov-
erable from responsible parties. Moreover, the two provi-
sions are not parallel. The former refers only to "removal 
costs," while the latter refers to a significantly broader activi-
ty--"developing and implementing plans." Because plan im-
plementation necessarily includes monitoring, it is far from 
clear that Congress would have thought it necessary to 
provide explicitly for the recovery of monitoring costs in the 
latter provision. More important, OPA's only provision defin-
ing the measure of natural resource damages recoverable 
under OPA contains no reference at all to monitoring costs.

 Because OPA is silent on the question before us, we 
proceed to Chevron's second step, where we have no doubt 
that NOAA acted reasonably by authorizing the inclusion of 
monitoring costs as part of restoration costs. According to 
NOAA, monitoring is an essential element of restoration:

 NOAA believes that restoration monitoring costs are a 
 recoverable component of natural resource damages. 
 Monitoring is essential to ensure that restoration actions 
 accomplish their intended goals and objectives and do not 
 cause unanticipated harm to the environment or public 
 health. In addition, monitoring is essential to determine 
 whether the terms of restoration agreements have been 
 met, upon which a release from liability is premised.

61 Fed. Reg. at 491. Not only does this conclusion seem 
eminently reasonable to us, but industry petitioners have 
suggested no reason for excluding monitoring costs from the 
cost of restoration.


 We are equally unpersuaded by industry petitioners' argu-
ment that, because monitoring takes place after assessment, 
NOAA improperly included monitoring costs as a component 
of assessment costs. In view of our conclusion that NOAA 
acted reasonably by including monitoring costs as a recovera-
ble cost, the precise heading under which the trustee may 
recover monitoring costs seems insignificant, particularly 
since industry petitioners have given no reason why it makes 
any difference at all.

 Relying on Key Tronic Corp. v. United States, 511 U.S. 809 
(1994), industry petitioners also challenge section 990.30's 
definition of assessment costs as including attorneys' fees. 
NOAA both concedes this point and advises us that it does 
not oppose vacatur of the definition of assessment costs to the 
extent that it refers to attorneys' fees incurred in pursuing 
litigation of a natural resource damages claim.

 NOAA's concession does not end this matter, however, 
because the parties continue to disagree about what other 
legal costs trustees may recover. Although both sides agree 
that trustees may recover assessment costs attributable to 
tasks that lawyers happen to perform but which others, such 
as engineers or private investigators, could have performed, 
they disagree about whether trustees may recover costs 
stemming from legal work not directly in furtherance of 
litigation (e.g., pre-litigation legal opinions, title searches) that 
only lawyers could have performed. In view of NOAA's 
consent to vacatur of this portion of the rule, we decline to 
resolve this question, instead leaving it to NOAA to draw the 
precise line between recoverable and nonrecoverable legal 
costs in subsequent rulemaking.

 III

 Industry petitioners present several other challenges to the 
final rule which, in view of representations made by NOAA in 
its brief and during oral argument, have been resolved. In 
order to document the agency's representations, we summa-


rize each issue briefly and include relevant oral argument 
excerpts in the appendix to this opinion.

 In their opening brief, industry petitioners argued that 
section 990.51 of the final rule, which they read to require the 
trustee to demonstrate only "injury," "exposure," and "path-
way," Brief for Industry Petitioners at 41, would allow trust-
ees to assess liability without evidence that the responsible 
party actually caused the oil discharge that did the damage, 
thus violating OPA's causation requirement. See 33 U.S.C. 
s 2702(a) (responsible parties only liable for damages that 
"result from" an oil discharge). NOAA responded by point-
ing to section 990.51(a)'s requirement that trustees must 
"determine if injuries to natural resources and/or services 
have resulted from the incident," claiming that it establishes 
an independent causation requirement. Brief for Respondent 
at 59 ("[T]he trustee must establish causation to the satisfac-
tion of the district court before liability can be imposed."). At 
oral argument, agency counsel reiterated her understanding 
that trustees must prove causation, acknowledging that this 
interpretation of the final rule would bind the agency in any 
future proceedings. See Appendix at 22-24.

 The parties also now agree on the correct interpretation of 
section 990.53(d)(3)(ii), which provides that when a trustee 
determines that the valuation of lost services is practical but, 
due to considerations of cost or time, the valuation of replace-
ment resources or services is not practical, "trustees may 
estimate the dollar value of the lost services and select the 
scale of the restoration action that has a cost equivalent to the 
lost value." 15 C.F.R. s 990.53(d)(3)(ii). Originally taking 
issue with the word "estimate," industry petitioners claimed 
that it conflicted both with the immediately preceding provi-
sion which directs trustees to "explicitly measure" the value 
of injured resources and services, id. s 990.53(d)(3)(i), and 
with a statement in the rule's preamble allowing trustees, in 
situations where valuing replacement services or resources is 
impractical, to "calculate" the value of the injured services or 
resources and then select the scale of the restoration action 
that has a cost equivalent to the lost value. 61 Fed. Reg. at 
453. According to NOAA, its use of three different terms--


"measure," "calculate," and "estimate"--has no significance 
because it used the words interchangeably. Brief for Re-
spondents at 54. To NOAA, the terms all mean the same 
thing. Indeed, Webster's Third New International Dictio-
nary defines "calculate" as "to reckon by exercise of practical 
judgment rather than by strict mathematical process: ESTI-
MATE." At oral argument, agency counsel confirmed 
NOAA's view that "estimate" means "calculate." See Appen-
dix at 24.

 The parties' final area of agreement relates to section 
990.27(b), which provides that the range of assessment proce-
dures available to trustees includes, but is not limited to, field 
procedures, laboratory procedures, model-based procedures, 
and literature-based procedures. 15 C.F.R. s 990.27(b)(1)(i)-
(iv). According to section 990.27(b)(2) of the final rule, trust-
ees may use these procedures alone or in any combination. 
Petitioners argued that because model-based procedures re-
quire no site-specific data or evidence of injury, the use of 
these models by themselves, as authorized by the final rule, 
would violate OPA's requirement that trustees develop site-
specific restoration plans. 33 U.S.C. s 2706(c)(1)(C) (trustees 
must "develop and implement a plan for the restoration, 
rehabilitation, replacement, or acquisition of the equivalent, of 
the natural resources under their trusteeship"). Responding 
that this argument rests on a misunderstanding of the final 
rule, NOAA explained that although trustees may use simpli-
fied procedures to assess damages, they may not, under the 
final rule, avoid developing site-specific restoration alterna-
tives, see 15 C.F.R. s 990.53(a)(2) ("Trustees must consider a 
reasonable range of restoration alternatives ... Each resto-
ration alternative is comprised of primary and/or compensato-
ry restoration components that address one or more specific 
injury(ies) associated with the incident."), unless, of course, a 
regional restoration plan or project already exists. Id. 
s 990.56. At oral argument, we asked agency counsel wheth-
er, if a trustee has used simplified methods to come up with a 
number representing the damages caused by an oil spill, the 
trustee could then simply send the responsible party a bill for 
that amount, or whether instead the trustee would have to 


develop an actual site-specific plan to restore the lost value. 
Counsel responded, and NRDC counsel agreed, that the final 
rule permits only the latter course of action, i.e., that the 
trustee could not send the responsible party a bill based 
solely on the number derived from a simplified model, but 
would have to develop a site-specific restoration plan or rely 
on an existing plan. See Appendix at 24-30.

 IV

 This brings us finally to the arguments advanced by insur-
ance petitioners. Lacking merit, they require but brief dis-
cussion.

 To begin with, petitioners have no standing to argue that 
section 990.20(b), which allows trustees who have begun 
damage assessments under CERCLA to switch to the final 
rule, is impermissibly retroactive. They make no claim that 
any particular trustee has switched to the final rule, nor have 
they argued, as they could not at this time, that such a switch 
resulted in a trustee imposing greater damages upon a re-
sponsible party insured by petitioners. Because petitioners 
have thus shown neither concrete nor imminent injury, see 
Louisiana Envtl. Action Network v. Browner, 87 F.3d 1379, 
1383 (D.C. Cir. 1996), challenge to this section must wait until 
a trustee actually switches assessment procedures and impos-
es heavier damages on a responsible party.

 Pointing to section 1002(b)(2)(A) of OPA, which makes 
responsible parties liable for "[d]amages for injury to, de-
struction of, loss of, or loss of use of, natural resources," 33 
U.S.C. s 2702(b)(2)(A), and to section 1006(d)(1)(B), which 
defines "natural resource damages" as "the diminution in 
value of those natural resources pending restoration," id. 
s 2706(d)(1)(B), insurance petitioners argue that OPA does 
not authorize recovery of passive-use values. We disagree. 
Nothing in the plain language of sections 1002 or 1006 
excludes passive-use values. These two sections simply pro-
vide for recovery of diminished value without indicating 
whether the value is of the active or passive variety. Con-
gress, however, clearly intended to authorize trustees to 


recover passive-use values. The House Conference Report 
defines diminution of value as "the standard for measuring 
natural resource damages used in [Ohio, at 462-80]," H.R. 
Conf. Rep. No. 101-653, at 108 (1990), reprinted in 1990 
U.S.C.C.A.N. 779, 786, and Ohio explicitly approves passive-
use values. Ohio, 880 F.2d at 464 ("Option and existence 
values may represent 'passive' use, but they nonetheless 
reflect utility derived by humans from a resource, and thus, 
prima facie, ought to be included in a damage assessment.").

 Insurance petitioners also challenge the final rule because 
it makes no reference to OPA's liability limits. As NOAA 
points out, however, nothing in the final rule affects a respon-
sible party's right to invoke the statute's liability limits. If 
trustees need resources above and beyond statutory limita-
tions to implement restoration plans, they may draw upon the 
Oil Spill Liability Trust Fund. 33 U.S.C. s 2712(a)(2).

 Insurance petitioners next argue that, by authorizing trust-
ees to assess costs for restoration activities undertaken after 
the date of the initial demand, the final rule violates responsi-
ble parties' rights under OPA to seek contribution from other 
responsible parties. Their concern stems from section 
1017(f)(3), which prohibits bringing contribution actions more 
than three years after either the date of judgment in any 
action under OPA for recovery of costs or damages, or the 
date of entry of a judicially approved settlement with respect 
to those costs. Id. s 2717(f)(3). Petitioners argue that if 
trustees impose costs for restoration activities undertaken 
more than three years after initial settlement, responsible 
parties will be unable to seek contribution. Petitioners' con-
cerns are unfounded. For one thing, the final rule requires 
trustees to estimate future monitoring costs and discount 
them to present value before demanding payment from re-
sponsible parties. 15 C.F.R. s 990.63(a). Even if trustees 
demand payment for activities undertaken more than three 
years after initial settlement, responsible parties can refuse 
payment, thus forcing trustees to bring a judicial action and 


to obtain another judgment, which would trigger the running 
of another three-year period during which responsible parties 
may bring another contribution action.

 Insurance petitioners' argue finally that the final rule 
grants trustees "uncontrolled discretion." But we think sec-
tion 990.27's requirement that plans be "reliable and valid for 
the particular incident" adequately constrains trustee discre-
tion, giving reviewing courts the authority they need to 
ensure the accuracy and reasonableness of natural resource 
damage assessments.

 V

 We vacate section 990.30's definition of "reasonable assess-
ment costs" to the extent that it includes legal fees, and 
section 990.53(b)(3)(i)'s authorization of residual removal au-
thority. We adopt NOAA's construction of section 990.51 
(trustee must prove causation), section 990.53(d)(3)(ii) ("esti-
mate" means "calculate"), and section 990.27(b) (trustee must 
develop site-specific restoration plans). In all other respects 
we uphold the final rule.

 So ordered.

 


 Appendix 
 
 Excerpts from September 11, 1997 Oral Argument *

Causation
 
THE COURT:Do I understand, do we understand that
 the parties are in agreement on this is-
 sue?
 
MS. MEDINA:I'm not sure I would characterize this "in 
 agreement." I guess I would say that 
 we have determined--
 
THE COURT:I read your brief as conceding that Peti-
 tioner was dead right and pointed out
 your regulation was never intended to 
 avoid causation.
 
MS. MEDINA:Absolutely. To prove legal causation, to 
 prove liability. That is something for 
 the Court to do. All the regulation re-
 quires is that we prove that the spill, the
 injury was derived from or resulted from 
 the spill.
 
THE COURT:Wait a minute. Now I don't understand. 
 You mean is the Government's--the 
 rustee can come in and say look, there 
 was a spill. I've shown it caused terrible 
 problems. Now it's up to you, your Hon-
 or, to determine who did it.... That is 
 not correct, is it?
__________
 * Ms. Medina is counsel for NOAA. Mr. Tsao, an attorney with 
the Natural Resources Division of the Department of Justice, also 
appeared on behalf of NOAA. Mr. Lehner appeared for NRDC. 
Mr. Bruce appeared for industry petitioners.

 
MS. MEDINA:That is not correct.
 
THE COURT:So you have to show causation.

MS. MEDINA:We do have a responsible party on the 
 other side of the table.
 
THE COURT:You have to show causation as part of 
 your case.
 
MS. MEDINA:Yes, we do, absolutely, but we don't have 
 to do it as part of our rule, as a part of 
 our process in assessing the damages.
 
THE COURT:That's not--I think the Petitioner quite 
 legitimately read the rule as suggesting 
 that there was some effort to avoid the 
 obligation to show causation and the 
 Government comes in, as often happens 
 on a direct challenge to rulemaking, says 
 no,we didn't intend that. That was--
 now, what is important and we have done 
 this on a couple of occasions, your brief 
 then agrees with Petitioner and says 
 look--agrees in the sense that we never 
 intended the rule to mean that.
 
MS. MEDINA:Right.
 
THE COURT:We mean the same thing you think it 
 should mean.
 
MS. MEDINA:Right.
 
THE COURT:That now, whenever it's reflected in our 
 opinion, then binds the Agency, does it 
 not?


 
MS. MEDINA:Yes, it does.
 
 
Estimates
 
 
THE COURT:Your position is that estimate means cal-
 culate?
 
MS. MEDINA:Yes, Your Honor.
 
THE COURT:Explicitly measure means being very 
 precise; estimate means a little general 
 and calculate means both is that it?
 
MS. MEDINA:I think we used the words very much 
 interchangeably. We didn't intend there 
 to be this huge distinction.
 
THE COURT:So I think Judge Silberman's question of
 an earlier issue if we write an opinion 
 and say we understand the word "esti-
 mate" in the regulation to mean "calcu-
 late" that's something the Agency--it 
 would be consistent with your under-
 standing of the issue?
 
MS. MEDINA:Yes, Your Honor.
 
THE COURT:Okay, that's it. So calculate and mea-
 sure are equivalent?
 
MS. MEDINA:Yes, Your Honor.
 
Simplified Procedures

THE COURT:[D]o I understand it works this way? A 
 simplified method is a computer program 


 of some kind that takes account of in-
 puts, I assume, that come from the site 
 of the oil spill. Is that right?

MS. MEDINA:Yes.

THE COURT:Okay, so it's not just a book you look into 
 like a logarithm table and say the answer 
 is X. You've had input regarding the 
 conditions at the oil spill site, right?
 
MS. MEDINA:Right.
 
THE COURT:Okay ... let's assume that that formula, 
 once you take account of the site specific 
 things produces a figure of $100,000 
 worth of damage. All right?
 
MS. MEDINA:Right.
 
THE COURT:Okay, are there any circumstances under 
 which that is the end of the process?
 
 
MS. MEDINA:I would think that we would still develop 
 a plan.
 
THE COURT:No, no, don't tell me what you think. I 
 want to know what the regulations say. 
 Are there circumstances under the regu-
 lation under which a trustee would send 
 that $100,000 bill to the responsible par-
 ty?
 
MS. MEDINA:No ...
 
THE COURT:Okay, let me go back to my intermediate 
 question. Are there any circumstances 
 under which the $100,000 calculation that 
 flows from the computer model that's 



 based on site specific data would be the 
 end of the process, that that's the bill 
 that you send to the responsible party?
 
MS. MEDINA:That's not the end of the process. We 
 then develop a plan ...

THE COURT:What function does the simplified proce-
 dure serve under the rules? ... In oth-
 er words, the tanker spilled X gallons of 
 oil off Juneau, Alaska. Look at our mod-
 el to see what that means in terms of 
 damage, bang, that's our simplified as-
 sessment. And what do you do with it 
 then?
 
MR. TSAO:Then you need to develop and implement 
 a plan to figure out how you're going to 
 compensate for that injury and as you 
 asked before, what you end up deciding 
 in terms of restoration plan could be 
 greater or less than $100,000 that comes 
 out of the simplified procedure. There's 
 no absolute requirement that it be the 
 same.
 
 MR. LEHNER: [T]o give you an example of how models 
 involved in mini-oil spills. You will 
 have a circumstance, for example, big oil spill 
 where the trustees contract with people, 
 go out, find out the actual extent of the 
 oil, how many birds are dead, what per-
 centage of the grass in the wetlands is 
 dead, et cetera, and then try to develop a 
 restoration plan accordingly.

 

 You can also use in a smaller spill a 
 model to help you do that. You put in 
 the inputs of the amount of oil of the 
 geographic area and they will come up 
 with estimates of the biological injury, 
 the type of biological injuries and also 
 using their economic data base, the ap-
 proximate costs of those. The trustees 
 can then use the simplified assessment 
 method, the model to develop the resto-
 ration plan.
 
THE COURT:So that's just stage 1, right?
 
MR. LEHNER:The assessment is stage 1 in the stage.
 
THE COURT:You have to go on to stage 3?
 
MR. LEHNER:Yes, stage 2 is letting the feds help out 
 the states, so it's really a two stage--
 assess and develop a plan and they all
 have to go to stage 2.
 
THE COURT:You develop a plan without a site specific
 activity?
 
MR. LEHNER:The rules provide for regional restora-
 tion plans and the Petitioners don't chal-
 lenge those. You do need--
 
THE COURT:Wait a minute, counsel. I didn't under-
 stand that at all. What do you mean?
 
MR. LEHNER:The rules--you can have a site specific 
 plan or you can--the rules allow a trust-
 ee to use what are called regional plans 
 ...
 
THE COURT:What is a regional plan?
 



MR. LEHNER:Let me give an example and explain it. 
 In 1990, in the New York Harbor, we 
 had six oil spills, six big oil spills in the 
 first half of the year. The oil kept the 
 same place again and again and some oil 
 was a little further to the west and a 
 little to the east, but it was all in the 
 same region.

 
 What the trustees recognized is that it 
 was absurd to develop six entirely sepa-
 rate plans in those cases. We could use 
 one plan to address all the different 
 spills. They were all site specific for 
 their specific region, but it doesn't make 
 sense to try to distinguish where you 
 can't.
 
 So what the rules do allow in our view is 
 you can use a model and then if there is 
 a regional plan, perhaps you can use 
 that, but you have to do--you do have to 
 come up with a plan. That's what the 
 statute makes clear and that's what the 
 regs make clear.
 
 
THE COURT:Do you really have as much problem 
 with that after you heard the Govern-
 ment's position?
 
MR. BRUCE:Well, if the Government's position were 
 written into the rules the way the Gov-
 ernment has articulated its position here 
 in Court today, I don't know what our 
 position would have been, but that's not 
 what the rules say. The rules explicitly 
 incorporate the Type A, DOI models. 



 They allow other models as well, but 
 they explicitly incorporate Type A DOI 
 models ...
 
THE COURT:What's so terrible about the DOI--
 
MR. BRUCE:No, no. I just want to tell you what they 
 do. The DOI models and this is 61 Fed. 
 Reg. At page 20562 describing those 
 models that were actually published after
 the NOAA's rule, they say "when trust-
 ees use a Type A procedure, that's the 
 model, they perform injury determina-
 tion, quantification and damage determi-
 nation through a computer model." 
 Keep that in mind, damage determina-
 tion. That's the number that comes out. 
 It's not an assessment. It's a--
 
THE COURT:Oh, but in the regulation it's only an 
 assessment?
 
MR. BRUCE:No, no. The Type A models are de-
 signed to put out a number that is the 
 whole shooting match, the whole thing, 
 and that's what these rules do. That's 
 what--
 
THE COURT:If we don't read them that way and the 
 Agency certainly, the Government cer-
 tainly hasn't suggested that in their ar-
 gument here, then you don't have a 
 problem. The fact that they're using 
 computers and starting with the simpli-
 fied method--that can't possibly be your 
 objection.... Your objection is if they 
 were going to impose, come to Court, 
 seek damages based on a computer with-
 out real hard evidence.


MR. BRUCE:Alone. That's correct.
 
THE COURT:And without any development of a plan.
 
MR. BRUCE:Without anything else. That's what the 
 rule allows them to do. Now if they've 
 abandoned that position, if they've 
 walked away from that and somehow 
 through the adjudicatory process they 
 can do that and the Court so holds, we 
 don't have an argument.